Thank you. Next case is number 2010-5108, Wells Fargo and Company against the United States. Mr. Abbott, when you're ready. Thank you, Your Honor. If you may please the court. My name is David Abbott. I'm for, for, uh, Wells Fargo. Uh, this case involves a sale-leaseback transaction. I was decided, uh, by the lower court for federal claims, Judge Wheeler's decision against the taxpayer. We're here today for, because three legal, overall legal errors were committed in that decision. All are new standards. All such errors involve new legal standards and impose on the taxpayer an impossible burden of proof. Uh, in summary that those errors were first of all, relating to the, whether the transactions have the sole effect of reducing taxes, whether the purchase option was virtually certain under circumstances where the, uh, the decision was based upon post hoc evaluation methods on information, not available at the time of closing. And third, whether the transactions, uh, were too profitable in that they would recoup profits, uh, the investment and the profit through rents alone, without regard to residual value. None of those standards, uh, exist in prior case law and, and therefore the decision should be reversed. Addressing the first of those. These transactions, as Professor Lease, who is the government's own, uh, economic expert stated, need both the pre-tax cash flows and the tax benefits to make economic sense. It's impossible for this court to hold that the, that the tax benefits were the sole reason for the investment. Under circumstances where you need both pre-tax cash flow and tax benefits for the transaction to be viable. I contrast that to a situation, the, the, this court, uh, ruled and Stobie Creek and Jay trading recently. In those situations, the tax benefits were approximately 10 to 20 times the investment made in the transaction. It was not difficult for this court to hold that the tax benefits were the sole reason for investing in those transactions. But even in those cases, this court engaged in a very deliberate and careful analysis of whether the transactions would still show a profit. Presumably had they done so, even with tax benefits, 10 to 20 times the excess of the investment. If they'd been profitable as well, it would have been upheld. This case is at the far other end of the extreme. When Professor Lease made his statement that they need both pre-tax cash flow and tax benefits to make economic sense of these transactions, that was in the context of being asked, what were his values as he computed it, of the value of the tax benefits in this transaction as compared to the investment? And one of the transactions was the subject, it was Belgium. In that situation in Belgium, the taxpayer, Wells Fargo, invested $9 million. Professor Lease is the government's expert. On calculation, the tax benefits were only worth $3 million, one-third of the amount invested. Not 10 times, not 20 times, one-third. It's impossible for this court to conclude that the sole reason for investing in these transactions was tax benefits under those circumstances. Compare that to a whole string of tax court cases dealing with lease transactions. The state of Thomas, only the tax benefits worth only 50% of the amount invested. You can also see Levy, Mukherjee, Torres, Geffen, all upholding the transactions, the lease transactions, all having tax benefits valued by the court at less than the amount invested. In fact, in the state of Thomas and Geffen, the court specifically noted that the relationship in determining that you cannot hold the transactions were invested in solely for tax purposes. Now contrast all of that then with the government's theories about whether these transactions were entered into solely for tax purposes as adopted by Judge Wheeler below. They use financial re-engineering manipulation, such as using present values, subtracting cost of funds, subtracting apples from oranges, in fact, these transactions are not profitable. In fact, the taxpayer conservatively estimated that these transactions would generate $61 million of pre-tax book earnings, pre-tax book earnings, conservatively estimated that figure could go up as high as 80 and might be higher depending on what happens with the residual values. Mr. Abbott, even if you are correct that there's some economic substance shown, don't you still have a problem with the substance over form side of this case? Absolutely, Your Honor. The taxpayer here has to show both of these transactions have economic substance that they were entered into and had effects beyond the tax benefits, but they also have to show that they were in substance, these transactions, not in form only, these transactions, but in substance, something else. It seems to me that's a more difficult argument for you to make. Well, Your Honor, I think that the, again, we have legal errors that have been committed in the court below in that determination. First of all, the most important element the courts have routinely accepted as determining whether somebody has the benefits and burdens of ownership or put another way, in substance, should be treated as the owner of the property, is whether or not in the context of a long-term hell or high water net lease, do you get back at the end an asset that has a meaningful residual? If so, you are considered to have the benefits and burdens of ownership. I'm not suggesting the test is as simple as that, but I think it's very clear from the authorities that that is the single most important factor. It is not important that the lessee controls the property. In the meantime, that is the nature of the net lease. Of course they do. They have possession. Is it your position that the Court of Federal Claims clearly erred in the underlying factual determinations with regard to the substance over form determination? I do believe that there are clear errors there, but what I think we need to focus on the fact is that there are legal errors in the analysis made by the court in reaching that conclusion. Well, what is your argument? That the Court of Federal Claims clearly erred or that there's a legal error? There's a legal error, Your Honor. So you're not focusing on any erroneous finding of fact? That's correct, Your Honor. We're focused on the fact that, as I said, the residual value is the key element in determining whether or not Wells Fargo maintained the ownership of the property. Residual value of the property can be negated if the lessee is granted a purchase option. Purchase options are extremely common. In the Supreme Court case, Frank Lyon, there were four purchase options. Here there's only one. But they're common, but they can, if structured improperly, negate the lessor's expectation of residual value. And when do they do so? They do so when it's virtually certain that they're going to be exercised. And there was a finding in this case by the trial judge that it was virtually certain that the purchase options would be exercised. Yes, there was. So doesn't that really mean your legal argument ends up turning on that factual finding? I think it turns on the standard that the court used to determine the virtual certainty of that exercise. Not the finding itself, but the finding was based upon an improper analysis, which was an illegal analysis, analysis not supported by the case law. And that was that the court did not use, and accepted the testimony of an expert who admitted he did not use, the fair market value standard in determining whether or not the option was virtually certain to be exercised. For over 50 years, courts and the IRS itself, in its own rulings, have considered the virtual certainty of an exercise of a purchase option in a lease context by reference to whether or not the option was set below fair market value, below fair market value, so it would be virtually certain to be exercised. In fact, by the IRS's own rulings, an option must be nominal in relation to fair market value, not just below, nominal in relation to fair market value before it will be considered virtually certain to be exercised. Here, however, the court below relied upon Professor Lease, who testified he was not using a fair market value standard, in fact, was using a standard that he had made up on his own, some 10 years after the transaction was closed, not based on any published authorities that Wells Fargo or its appraisers could have had access to and consulted at the time of the closing. Had they been able to do so, they could have come to the same conclusion. But instead, many years after the fact, the government brings an expert in to testify as to his personal opinion, that it was virtually certain, because he computed a value well in excess of fair market value, that these particular lessees might be willing to pay. To make sure that I understand the point that we're discussing now and its significance in the case, would you agree that if the trial judge was correct, I know you dispute this vigorously, but if the trial judge was each case virtually certain to be exercised, that the outcome of the case was correct? I would concede that that would be the case if the conclusion that that was based upon was based upon knowable information at the time of the closing and not based upon the personal information, a personal opinion of somebody many years after the fact, which was unknowable. This court in Stobie Creek observed the transactions have to be analyzed based upon the events and information available at the time of the closing. Perhaps most succinctly, the tax court in Levy said, businesses cannot operate on the basis of hindsight. I would submit that taxpayers cannot file their tax returns on the basis of hindsight. This information was not available to anybody. The defendant and its expert have cited no published sources that would give rise to anybody thinking that the valuation methodology used by Professor Lease would have, should have been anticipated to be used by these particular lessees in their analysis. These particular lessees are being imputed by the government's expert to pay well over or be willing to pay well over fair market value in order to obtain these assets back and therefore make the purchase option by that distorted analysis seem compelled. But in fact, although a lessee might be willing to pay more by his analysis, there's no reason to believe and Wells Fargo had no reason to anticipate that a lessee would have taken that analysis, would have done so, and should have certainly should have taken into account that a lessee, although they might be willing to pay more, would actually do so. Now, if the purchase options had not been exercised, presumably the service contract option would have been exercised. It very well could have been. I mean, I assume that the one thing that wasn't going to happen as far as Wells Fargo was concerned was that a bunch of buses, old buses, were going to be driven from New Jersey and parked in front of the bank in Chicago. Well, you weren't going to take possession of those buses. Your Honor, I don't think you can presume that. These transactions... Tell me if that's a realistic prospect. Let me address that. These transactions were not done by Wells Fargo's tax department. They were not done as one-off transactions. They were done in the context of a leasing business. Leasing businesses lease aircraft. Virtually every aircraft flying overhead has been leased. Leasing businesses rent rail cars. They rent automobiles. They are not... I think we can presume that Wells Fargo is not hoping to, when it gets back an aircraft, fly it around. They're going to sell it. They're not hoping to get back thousands of automobiles and have to drive them around. They'll sell them. In this particular transaction, if Wells Fargo is presented with a return of the property, they have employees whose very purpose is to take those assets back and re-market them. So whether they exercise a service contract or re-market it to somebody else is a decision they will make at the time. And in fact, Wells Fargo had an appraisal done at the closing, which indicated that taking the asset back and selling it was probably the more attractive option. So you addressed the question of the service contract. Yes, Wells Fargo does have the ability to require the lessees to find a service contract, not to be the service recipient. The lessees can walk away. When they're after these transactions, the leases are over, the lessees can meet certain return requirements, find a service recipient, which again, an opinion was obtained at the closing date saying that service contracts were perfectly reasonable commercial contracts, normal in that industry. And they can find that person and they just walk away. In fact, WMATA here, Washington, D.C., is already planning on replacing the equipment that's in this lease. This is years before the transaction comes to an end, but they're already engaging in that advanced planning. They could walk away from this asset when the lease is over. They can replace it with another asset and they're engaging in a process right now. And this is in the record of looking at the pros and cons, the cost and so on. And so there's nothing at all burdensome about the walking away from the asset. In fact, it may well fit into their exact corporate plans. Is there a history of this form of leasing transaction and its tax consequences? I mean, we know that by statute now it's no longer permitted. And I didn't see any representation as to how long or how many years or decades such tax procedures may have been accepted by the service. Well, I think that there's two answers to that. First of all, the leases to tax exempt entities, which each of these transactions involved. Now, Wells Fargo did many other leases that were not involved in tax exempts. These were the only ones that were disputed. But leases to tax exempt entities have been around for decades. In fact, in 1984, Congress specified new rules at that point in time to deal exactly with the situation of when a U.S. taxable party leases to a tax exempt, such as a municipality or foreign party. Nineteen eighty four decades ago. And they specified that there was nothing wrong with that. But they would reduce the tax benefits that the investor, Wells Fargo, would get in that situation. And we have complied, Wells Fargo has complied 100 percent with those rules. The tax benefits in these transactions is, in fact, much less than it would be if they had just engaged in another one of their, which they already have, class one railroad type leases to the Burlington Northern or so on.  They chose these transactions for diversification needs. They already had a lot of class one railroads. They wanted different asset types. That's why they did these. But to answer your question, yes, decades ago, even before then, because Congress was reacting to what they perceived to be a practice that people were leasing to municipalities. And there was nothing wrong with that, but they reduced the tax benefits. The second part of your answer is, is there a practice of these particular transactions of the type that we're looking at here, if these are somehow different? Well, the genesis of these transactions comes from Wells Fargo's own leasing business. They had engaged in leasing transactions with many people. Some of their employees had engaged in municipal leases over the years, golf courses, things like that. And they had a long experience with these things. The IRS itself knew about these transactions in 1993, years before any dispute arose here. Their attention was brought to these transactions by the FTA itself. The FTA is the governing or regulatory body regulating municipal transit agencies. And they do so because they give out grants of money. The FTA, when they give out a grant of money on a particular property, has certain oversight obligations with respect to that property. These transactions, to the extent that FTA money was invested in them, could not be closed without the FTA's approval. But the FTA explicitly said they're not saying anything about the tax consequences. It's absolutely true that the FTA does not give tax rulings. But just as in Frank Lyon, where the business and regulatory realities of that particular transaction, in that case bank regulations, informed on and dictated to some extent the structure of the transaction, here you have the same regulatory realities. The lessees were actually being encouraged by the United States government to enter into these transactions pursuant to a presidential directive and pursuant to the FTA's own  And they said, if you do this, obtain private funding for your operations. Obtain private funding to buy new cars. And that's exactly what they did. But obtain private funding to buy new cars, that, as I understand these transactions, was exactly what didn't happen in this case. Those cars were already owned. There wasn't any infusion of capital. Well, the FTA would disagree, Your Honor. The FTA was in this. Rather than relying on what the FTA might or might not say, how is it that there's an infusion of capital here when, as I understand the transaction, setting aside the equity investment portion of the transaction, but just looking at the lease and payment relationships between the parties, it seems to me to be, at least, and it certainly was found by the trial judge, to be a circular flow of cash that didn't have a net increase in assets flowing to the transit. Well, first of all, the transit agencies did obtain capital from these transactions. Well, they obtained a payment from you for their participation in this transaction. But setting that aside, is there any net flow of capital? I thought that the lease payments were balanced equally so that there was, in effect, a wash between Wells Fargo and the transit agencies. It's common in all leveraged leases for the lease payments to be structured so as to meet the debt service payments. And courts have routinely held that to be a neutral factor in determining whether it's a true lease or not. What happened here is that the transit agencies, or Belchcom, received a substantial amount of money. They received fair market value of the property. They also, in three of the cases pursuant to FTA's, their own directives, and in one case pursuant to the state of California's directives, were mandated to put that money aside to some extent to deal with their future obligations. It is the nature of any financing, whether it's a lease financing, debt financing, and so on, that you receive money up front and you pay it back later. Although if that didn't happen, we wouldn't have a profit motive. So that is just the nature of the transaction. Now, that money that they set aside was set aside at the risk of and for the benefit of the lessees. It's their money. And you do not have a statement from the lower court saying otherwise. It is their money. Now, to look only at the cash flows, frankly, exalts the form over the substance. This court's predecessor in Osario, 1937, found that it is the payment of the obligation that gives rise to an income and discharge of an obligation that gives rise to an income, not whether the person actually makes the payment themselves. The cash flow and how the cash flows is form. The government's arguing form. The substance is, is that cash flow being used to satisfy the lessee's rental obligations? And it clearly is. And then the lessee's at risk for that. For instance, in Hoosier Energy, a recent case in the Seventh Circuit, decided by Judge Easterbrook. That's exactly what's happening. The money set aside, or these security arrangements arranged, are in default. In fact, in that particular case, it was Ambec filed for bankruptcy last month. They're in default. Who has to still pay? The lessee still has to pay. This is their money. Now, you might, the government may not like how they've invested their money. They've invested it in some bonds or securities and payment obligations and so on. But it's their money. And that money is paying their obligation. From Wells Fargo's point of view, that's all we have. We have rent payments coming in. We have a hope for residual. And that is where our profit comes from. That is the nature of our investment. We have no interest in, other than as collateral, whatever the lessee has put the money to satisfy the lessee's own obligations in the future. And I believe I've eaten well into my rebuttal time. You are. We'll save you rebuttal time, Mr. Adler. Thank you. Mr. Johnson. Good morning. May it please the court. 26 tax shelter silo transactions were at issue in this case. The parties presented only five at trial, however, because all 26, as are all lilos and silos, for that matter, fundamentally similar in their structure and in the features relevant to their tax treatment. And it's those common features that also distinguish silos and lilos, for that matter, from traditional tax shelters. And to answer your question, Judge Newman, about the history of these transactions, the history of silos is very short. They came onto the market in the late 1990s after the IRS discovered the lilos and shut them down by issuing a revenue ruling. Lilos similarly had a very short life in the mid-1990s to late 90s. They were shut down. The testimony in the record from the trial is that silos, with these features, with the loop debt, with the equity outlay invested in the equity defeasance account, with the reciprocal options, all the features that the court described in its opinion, were all new in that package. And they came onto the market in the late 1990s when the lilos couldn't be done anymore. People were unwilling to do them. So they tweaked the transaction just a little bit to claim that it was different. But as any comparison of the description of transactions here with those in BB&T and AWG and the other cases shows, they're fundamentally the same. OK, but the question is still there. The silo was eventually shut down by Congress. The legislation was not made retroactive. What was being done, whether one views it as an ingenious tax shelter or whatever else, had been accepted, was not on its face, illegal, at least viewed at the time. And yet now we're asked retroactively to reach back for these years for which the statute hasn't run and essentially extend the legislation result backward for another six years. I would disagree based on two points, Your Honor. First, we didn't rely on the statute in the trial court, nor did Judge Wheeler rely on the statute. Well, never mind the length of the statute. Still, we have a legislative change. And there are no transactions before us after that legislative change. But here we have the situation which was the subject of the legislative change. And all sorts of rules about ex post facto laws, and I don't know what else, come to mind. And isn't that what we're being asked to do? No, Your Honor. The court's being asked to apply longstanding common law doctrines under Frank Lyon and the substance over form doctrine, as well as the economic substance doctrine, which long predate the Jobs Act of 2004, and under which these silos fail. And that's what Judge Wheeler found. He applied the Frank Lyon case, as well as the similar appellate court cases and lower court cases which apply the principles of Frank Lyon. And Frank Lyon was decided in the 1970s. And that laid down a clear rule, as further explicated in BB&T and AWG and the Coleman and Swift-Dodge case, and the State of Thomas case from the tax court, and numerous other cases, that in order to claim a depreciation deduction in a transaction that purports to be a sale-leaseback, the taxpayer who wants to claim a depreciation deduction needs to have an actual equity outlay, invested and committed to the property, and subject to consumption because of depreciation in that property. Yes. I have no trouble with the equities or the arithmetic. But here we have a situation with the full knowledge of the FDA. The FDA asks the IRS, what do you think of all this? And they say, well, we're not going to tell you. And the FDA tells the taxpayer that you're on your own. I suppose that's all right. But in fact, with all of the open knowledge and tacit understanding, followed eventually by legislative change, one really does have to wonder about the equities, the fairness of this retrospective change. A few points, Your Honor, regarding the claim that the IRS knew about these transactions. I don't think the record supports that. In the record, the record said, and I don't recall the contribution, that the FDA asked the IRS for advice. And their answer was, we don't give advice to other government agencies, only to taxpayers. Yes. The evidence in the record is a letter from the IRS to the FDA. We don't have any evidence of what type of transaction the FDA told the IRS about. And as I mentioned earlier, silos didn't come into the market. And that's undisputed until the late 90s. But I don't recall the government raising that issue or disputing, well, they weren't asked the right question in this litigation now. What the evidence in the record shows, Your Honor, is that the IRS told the FDA, if you have taxpayers who want to enter into these transactions with entities that are FDA grant recipients, they can come to the IRS and ask for a private letter ruling. There's a procedure for doing that. Taxpayers can submit the documentation. We'll look at the entire transaction and give them a private letter ruling, or perhaps we'll tell them we can't do one. Wells Fargo was aware of that procedure. They could have gone to the IRS and said, please give us a ruling. Do silos pass muster? Can we claim tax depreciation deductions? Wells Fargo elected not to do that. And in fact, Wells Fargo was fully aware. It's a sophisticated entity, a bank, who hired tax lawyers. Did you say we should hold it against the taxpayer, that the taxpayer didn't seek a private ruling? I think Wells Fargo, the evidence shows that Wells Fargo knew that the, from their own presentations for each transaction, they say the IRS may disallow this. They were fully aware that they were taking a risk as to whether or not these pass muster under the tax laws. And Wells Fargo has never made an estoppel argument that somehow they relied on the FDA or they relied on the IRS not finding these sooner than they did. That's never been a claim, and they don't claim that. No, I'm looking at the retrospective effect of the legislative change. And one point of clarification that, Your Honor, if I could make on that, the legislative change in 2004 is section 470, and that prescribes a particular new type of treatment for these transactions in the legislative going forward, prospectively, for those transactions entered into 2004. As we cited in our brief, the legislative history is very clear that this prospective change was not intended to affect at all the treatment of prior transactions under the longstanding test that in order to claim depreciation deductions, you need to have the benefits and burdens of ownership. And that's the law that both parties agree has to be applied here, and that is whether Wells Fargo in each of these transactions acquired the benefits and burdens of ownership, acquired a depreciable interest when it entered into the transactions. Do you, or would you address the question of the finding made by the trial court as to the virtual certainty of the exercise of the purchase option and Mr. Abbott's argument that there was legal failure on the part of the trial judge and on the part of Mr. Liss, Dr. Liss, I guess it is, with respect to his analysis of the underlying economics of that transaction? Certainly, Your Honor. First, I would just note as a preliminary point that as the trial court found and as we argued, whether or not the purchase option is going to be exercised or whether it's virtually certain is not necessary to determine that under the substance over form doctrine they didn't acquire a depreciable interest. And as the court explained and as the DB&T court explained, that's because they have the sole option to impose the service contract, which is the functional equivalent. Well, that's the second part of the question, is the extent to which the service contract is really just another form of imposing the purchase option. I'd like you to discuss that briefly as well, but if you could talk about the question of virtual certainty, I'd appreciate it. Certainly, Your Honor. What Professor Liss did was look at the appraisals that Wells Fargo had obtained at the time they had entered into the transaction. And in these appraisals, the appraiser set forth a value for the property at the time of entering into the transaction, and they forecasted values at the time of the FPO decision and also values at the time of the end of the service contract. Or in Belgicom, the end of the continued lease after the EBO. He adopted and used the values that those appraisers gave the property. So the attack on Professor Liss for not using the correct value is a bit puzzling, to say the least. What Wells Fargo is really arguing is a factual question. And a question that was the subject of expert testimony with the court heard, and that is, what is the proper discount rate to use to model and try to determine what is the transit agency or what is Belgicom going to decide when it's faced with the FPO decision? And like the appraisers, Professor Liss looked at that decision and said, well, they have two choices. They can exercise the FPO, in which the money in the defeasance accounts goes to Wells Fargo. Or they can not exercise the FPO, and then they're staring at this service contract. Wells Fargo can impose that service contract with all its costs, and those are the preset basic fees that were determined at the contract's inception to give Wells Fargo the same return in the service contract that it would get in the FPO. And the other cost of the service contract is, at the end of it, they may lose the equipment. So he added up these costs. And some of those, even at the FPO point, are future costs. They are the basic fees going out to 10, 11 years during the service contract term. And Professor Liss recognized that the time value of money is relevant. A dollar paid 10 years in the future is not the same as a dollar paid today. So he used a discount rate, a hurdle rate he called it, that the transit agencies would face to discount that future payment stream or the costs or benefits in the various alternatives to the FPO point. So you could have an apples to apples comparison. What's the cost and benefits of the FPO at that point in time? What are the costs and benefits of the service contract at that point in time? And he used the discount rates to put on a common denominator those various streams of costs and benefits over time from the various scenarios. And that is the crux of Wells Fargo's argument. Not that he didn't use the correct values or that he used the same values as their appraisers used. Or the value of that equipment at various points of time. It's an attack on the discount rate. And that is something that the court heard testimony about and found that Professor Liss was the only one who provided a convincing argument as to what discount rate should be used. And in fact, Wells Fargo didn't present any witnesses that gave an opinion as to what discount rate would be used. The appraisers used different discount rates in their appraisals. Wells Fargo, however, did not designate them as experts. Did not have them testify as to what discount rate should be used and why. Instead, they hired or they retained and presented rebuttal expert witnesses who criticized Professor Liss's discount rate. But when asked by the government and indeed by Judge Wheeler, what do you think the appropriate discount rate should be? Neither had an opinion. They specifically testified that we have no opinion. So Professor Liss was the only one who provided an opinion and with supporting evidence, we believe, for what discount rate should be used. Remind me, thank you. Remind me on a different point now. I understand that the equity defeasance account would be used to fund the purchase option if that option were exercised. What happens in the event of non-exercise? What happens to the equity defeasance account? Under the terms of the agreement, if a service contract is imposed by Wells Fargo, Wells Fargo can demand full equity defeasance and debt defeasance. Similar to that was in place from day one under the initial sublease. So Wells Fargo has the sole power to say, okay, we're going to impose the service contract and we also want full equity and debt defeasance. And what that practically means is that the funds in the equity defeasance account and the debt defeasance account will not be given to the transit agency. They'll be just rolled over. Now, whether you say that they take it for a minute and then put it back, money's fungible. So the end result is there's no net cash flow to the transit agencies when the service contract is imposed because Wells Fargo has the option and indeed said in its internal analyses of the transactions that we will require full debt and equity defeasance. And that is because in the service contract, that provides them the same protection as they had in the initial sublease term. And that is even if the unexpected happens and there's some failure in payment or default, they simply grab the defeasance account and they get their money recouped anyway. You have a little more time if there are more things you want to tell us. I would like to make one point about the substance over form doctrine, which Judge Lynn raised. And that is distinct from the economic substance doctrine. These are two independent doctrines, under both of which the trial court found these transactions failed. And under the substance over form doctrine, the arguments about business purpose or profit motive or whether these were profitable simply are not relevant. The substance over form doctrine looks at the actual economic realities of the transaction and whether under the code sections at issue, they in substance here acquired a depreciable interest rather than just in form or that they wanted to be the owner or that they are labeled the owner. We have to look at the actual substance. And for that, other business purposes that are relevant under the economic substance doctrine do not control. Any more questions? Thank you, Mr. Johnson. Thank you. First, I'd like to address Joseph Bryson's question just towards the end there. If the purchase option is not exercised, does the lessees get their money back? And the answer is yes, it's their money. And they can get their money back. They always get their money back. They always get their money back. Whether it's used to satisfy their continuing obligations, which they've undertaken, or they can put it in their own pocket. I thought that was the case. I just wanted to be sure that that was true in the service contract setting as well as in the FPO setting. Sorry, Your Honor. Go ahead. First of all, WMATA, for instance, here doesn't have to be the service recipient. They could easily take the trains here. And there's evidence in the record that says they could be used, for instance, in Miami and other places. They could be taken there, and they could arrange a service contract there. In which case, WMATA keeps 100% of the money in these defeasance accounts. Even if WMATA decides that it's in their economic interest to be the service recipient, which is a viable option. WMATA is authorized to be a service, to enter into service contracts by their own charter. If they decide that's economically viable, the money is still there. They can either use it to pay their future obligations, which they've decided on economic terms is sensible. Or they could even substitute, they could keep the money and put a letter of credit in there, as opposed, an unfunded letter of credit, which is a common form of credit support. The government's own expert, leasing expert, Mr. Shinderman, testified that defeasance is an appropriate way to address the mechanism of municipal credits, whose budgets have to be satisfied every year. And whether they pay an obligation or not stems from them actually apportioning money in their budget to pay the money. Defeasance is a way to mitigate that risk. It's an appropriate means, which the government's own expert testified was appropriate. The discount rate, Mr. Johnson discussed, with respect to the present value of the residuals in the purchase option calculation. The appraisers, which Wells Fargo commissioned at closing, had that calculation just as Professor Lee's did. The difference is, as Mr. Johnson pointed out, in the discount rate. The appraisers used a discount rate that, based upon public sources available to them at the time, indicated it should be risk adjusted for the risk of that particular cash flow. The particular cash flow in question is residual value. It's uncertain. It's an equity-like cash flow. No one knows what that residual value will be 10 years later. They used a discount rate appropriate to the risk inherent in that cash flow. Professor Lee's, on the other hand, used a debt-like discount rate. In fact, a low debt-like discount rate, low to reflect that these transit agencies can borrow cheaply. A debt-like discount rate does not reflect the uncertain cash flow that's being discounted. It's the subject of the discounting exercise. By doing so, he vastly overvalued the value of that residual. Vastly overvalued the option of buying back the property. And that is legal error. You cannot use a discount rate that does not reflect the risk of the underlying cash flows. You certainly cannot do so, in the face, choose that discount rate in the face of having no published authorities telling you that's the right thing to do, that we could have relied upon at the time we closed the transaction. We give you a very short parable. Warren Buffett at Berkshire Hathaway, I presume, borrows very cheaply. GM does not. I don't believe Warren Buffett, when they're competing against GM for the purchase of a parcel of real estate, will overpay for that asset more than fair market value, just because Warren Buffett borrows more cheaply. That isn't going to happen. There was no reason for Wells Fargo to anticipate these lessees were going to act in such an irrational manner. I'd like to also address the question of whether the service contract is just another form of imposing the purchase option. The purchase option was set here to be above fair market value. No compulsion to exercise that at all. Now, put yourself in the shoes of the lessee who has to ask themselves, do I want to exercise the purchase option and pay more for the value of the property for its entire remaining useful life, or do I want to undertake a service contract option, which maybe is more, maybe not, but let's assume even if it is, more set at a price that's above fair market value. Would I rather pay more for the entire remaining useful life of the property or only pay more for a portion? That analysis was done at the closing by the Wells Fargo's appraisals, and they concluded a lessee economically motivated, rationally motivated, would choose to pay under the service contract obligation as being cheaper than buying at an inflated price for the entire value of the property. I'd like to also address Mr. Johnson's use of the word silo and lilo. He seems to think that these transactions silo, as he refers to them, a term that was not used by anybody at the time, were the outgrowth of the lilo transactions. There's just nothing in the record that supports that. In their briefs, they refer to a CRS report, which was prepared many years later, was not presented in the record. The author of that report was not presented as an expert. I had no chance to cross-examine them. I don't know what sources they relied upon. It's simply not in the record. It's just argument by name calling. In fact, these transactions were closed by business units, by business people, and the service contract feature itself, the record shows, was introduced here because the first of these transactions, Caltrans, Caltrans itself, a transit agency in California, had service contracts with Amtrak, Amtrak at the time, and so was familiar with the concept, was familiar with the obligations, the risk, and the operational requirements under a service contract, and the service contract was introduced here for that purpose. That's what the record shows. Okay, one closing remark if you need to tell him. The government has stated that they don't believe the purchase option, whether it's compelled or not, is relevant because they have their recoupment argument. The recoupment argument is entirely novel. It's never been addressed by court, but would put this court, frankly, inconsistent with the commercial law treatment under the UCC of how transactions should be treated under commercial law for substantive purposes, and if the court adopts the recoupment theory, they would be in conflict with that, and I think that's it, Your Honor. Thank you very much. Okay, thank you, Mr. Abbott, Mr. Johnson. Case is taken under submission.